# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**NICHOLAS DeFRIES**,

        Plaintiff,

   v.

**UNION PACIFIC RAILROAD COMPANY**,

        Defendant.

Case No. 3:21-cv-205-SI

**OPINION AND ORDER**

Anthony S. Petru and Gavin Barney, HILDEBRAND MCLEOD & NELSON, LLP, 5335 College Avenue, Suite 5A, Oakland, CA 94618, and James H. Kaster and Lucas J. Kaster, NICHOLS KASTER, PLLP, 4700 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402. Of Attorneys for Plaintiff.

William H. Walsh, COZEN O'CONNOR, Suite 1900, 999 Third Avenue Seattle, WA 98104, and Bobbi Britton Tucker, COZEN O'CONNOR, One Oxford Centre, 41st Floor, 301 Grant Street, Pittsburgh, PA 15219. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

      Plaintiff Nicholas DeFries ("DeFries") worked as a locomotive conductor for Defendant Union Pacific Railroad Company ("Union Pacific") from July 2004 through March 2018. DeFries has a color vision deficiency, which he contends is minor, does not limit any major life activity, and does not prevent him from performing his essential job functions, including discerning colors in railroad wayside signals. In March 2018, DeFries underwent standard color vision acuity testing and failed the scientific "Ishihara" 14-plate color vision test. He was temporarily removed from service in March 2018. In May 2018, he took Union Pacific's

proprietary secondary color vision field test ("CVFT"), the "Light Cannon" test, and failed that test. After appealing his secondary test due to testing conditions, he retook the Light Cannon in July 2018 and again failed that test. Union Pacific then permanently removed DeFries from service as a locomotive conductor.

DeFries brings claims alleging disparate treatment and disparate impact under the Americans with Disabilities Act ("ADA"). DeFries contends that Union Pacific "regarded" DeFries as disabled. He asserts that Union Pacific violated the ADA by using its proprietary CVFT, the Light Cannon, that was facially discriminatory against DeFries because of his perceived color vision disability and that served to screen out persons like him, with perceived color vision deficits. Union Pacific asserts as affirmative defenses business necessity, direct threat, and the *Albertson's* doctrine, based on *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555 (1999).

Now before the Court are Union Pacific's motions to dismiss based on lack of subject matter jurisdiction and for summary judgment. Union Pacific argues in its motion to dismiss that DeFries's ADA claim implicates the Hobbs Act, and thus jurisdiction is appropriate only in the circuit court of appeals, after exhausting administrative remedies. DeFries responds that his claims of disability discrimination are properly before this Court. In its motion for summary judgment, Union Pacific argues that DeFries cannot show that he is a qualified individual under the ADA, that disparate impact claims may not be brought in a "regarded as" claim under the ADA, and that Union Pacific prevails on all three of its affirmative defenses as a matter of law.[1] For the reasons explained below, the Court denies Union Pacific's motions.

_____

[1] Union Pacific also raises in its supplemental summary judgment brief, which the Court permitted after this case was remanded, the same jurisdictional argument it raises in its motion to

## STANDARDS

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

Union Pacific styles its motion as one under Rule 12(h)(3) of the Federal Rules of Civil Procedure, distinguishing such a motion from one under Rule 12(b)(1) because a Rule 12(h)(3) can be brought at any time and need not be responsive to any pleading. Defendant misunderstands Rule 12(b)(1) motions. The Ninth Circuit has explained that "[a] Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction . . . may be made at any time." *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 319 (9th Cir. 2017) (citing Rules 12(b)(1) and 12(h)(3)), *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S. 273 (2019). "[T]he deadline for making a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is prolonged by Rule 12(h)(3) . . . ." *Wood v. City of San Diego*, 678 F.3d 1075, 1082 (9th Cir. 2012). Thus, the Court construes Union Pacific's motion as one under Rule 12(b)(1) of the Federal Rules of Civil Procedure, as extended by Rule 12(h)(3).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be either "facial" or "factual." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack on subject matter jurisdiction is based on the assertion that the allegations contained in the complaint are insufficient to invoke federal jurisdiction. *Id.* "A jurisdictional challenge is factual where 'the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'" *Pride v. Correa*, 719 F.3d 1130, 1133 n.6 (9th Cir. 2013) (quoting *Safe Air for Everyone*, 373 F.3d at 1039)).

---

dismiss. The Court, however, addresses that argument in the context of Union Pacific's later-filed motion to dismiss.

Union Pacific brings a factual challenge to the Court's subject matter jurisdiction. When a defendant factually challenges the plaintiff's assertion of jurisdiction, a court does not presume the truthfulness of the plaintiff's allegations and may consider evidence extrinsic to the complaint. *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012); *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009); *Safe Air for Everyone*, 373 F.3d at 1039. A factual challenge "can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996) (quotation marks omitted).

**B.  The Hobbs Act**

Under the Administrative Orders Review Act—also known as the Hobbs Act[2]—the court of appeals, in all jurisdictions except for the Federal Circuit, has exclusive jurisdiction to "enjoin, set aside, suspend . . . or to determine the validity of . . . final agency actions described in section 20114(c) of title 49." 28 U.S.C. § 2342(7). Further, "a proceeding to review a final action of the Secretary of Transportation under this part or, as applicable to railroad safety, chapter 51 or 57 of this title shall be brought in the appropriate court of appeals as provided in chapter 158 of title 28." 49 U.S.C. § 20114(c).

**C.  Motion for Summary Judgment**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden,

---

[2] This Hobbs Act is separate from a different Hobbs Act that deals with robbery and extortion offenses. *See* 18 U.S.C. § 1951.

"the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

# BACKGROUND

## A. Federal Regulations

The Federal Railroad Safety Act ("FRSA") ensures that "[l]aws, regulations, and orders related to railroad safety and . . . railroad security shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). To that end, the Department of Transportation ("DOT"), through the Federal Railroad Administration ("FRA") has promulgated comprehensive regulations to ensure that only qualified individuals operate as train conductors.[3] 49 C.F.R. §§ 242.1-242.511. These FRA regulations include provisions for locomotive conductor certification, recertification, and denial of certification. "The FRA does not actively participate in engineer [and conductor] testing or certification, but administers the regulation through approval and monitoring of individual railroads' programs, including their training and testing regimens." *Carpenter v. Mineta*, 432 F.3d 1029, 1031 (9th Cir. 2005).

The certification program for each railroad must include a procedure for evaluating vision for conductors that conforms with 49 C.F.R. § 242.117. The FRA sets minimum thresholds for visual acuity and states, in relevant part: "Except as provided in paragraph (j) of this section, each person shall have visual acuity that meets or exceeds the following thresholds: . . . (3) The ability to recognize and distinguish between the colors of railroad signals as demonstrated by successfully completing one of the tests in appendix D to this part." 49 C.F.R. § 242.117(h). Subsection (j), in turn, provides:

> A person not meeting the thresholds in paragraphs (h) and (i) of this section shall, upon request, be subject to further medical evaluation by a railroad's medical examiner to determine that

---

[3] Union Pacific cites regulations governing train engineers in some of its briefing (49 C.F.R. §§ 240.1, *et seq.* and Appendix F). Because DeFries is a train conductor, however, the Court cites the similar regulations governing train conductors (49 C.F.R. §§ 242.1, *et seq.* and Appendix D).

person's ability to safely perform as a conductor. In accordance with the guidance prescribed in Appendix D to this part, a person is entitled to one retest without making any showing and to another retest if the person provides evidence substantiating that circumstances have changed since the last test to the extent that the person could now safely perform as a conductor. The railroad shall provide its medical examiner with a copy of this part, including all appendices. If, after consultation with a railroad officer, the medical examiner concludes that, despite not meeting the threshold(s) in paragraphs (h) and (i) of this section, the person has the ability to safely perform as a conductor, the person may be certified as a conductor and such certification conditioned on any special restrictions the medical examiner determines in writing to be necessary.

*Id.* § 242.117(j).

Appendix D specifies:

(2) In determining whether a person has the visual acuity that meets or exceeds the requirements of this part, the following testing protocols are deemed acceptable testing methods for determining whether a person has the ability to recognize and distinguish among the colors used as signals in the railroad industry. The acceptable test methods are shown in the left hand column and the criteria that should be employed to determine whether a person has failed the particular testing protocol are shown in the right hand column. [Listing eight Pseudoisochromatic Plate Tests and four Multifunction Vision Tests, and their failure criteria.]

* * *

(4) An examinee who fails to meet the criteria in the chart, may be further evaluated as determined by the railroad's medical examiner. Ophthalmologic referral, field testing, or other practical color testing may be utilized depending on the experience of the examinee. The railroad's medical examiner will review all pertinent information and, under some circumstances, may restrict an examinee who does not meet the criteria for serving as a conductor at night, during adverse weather conditions or under other circumstances. The intent of § 242.117(j) is not to provide an examinee with the right to make an infinite number of requests for further evaluation, but to provide an examinee with at least one opportunity to prove that a hearing or vision test failure does not mean the examinee cannot safely perform as a conductor. Appropriate further medical evaluation could include providing

> another approved scientific screening test or a field test. All railroads should retain the discretion to limit the number of retests that an examinee can request but any cap placed on the number of retests should not limit retesting when changed circumstances would make such retesting appropriate. Changed circumstances would most likely occur if the examinee's medical condition has improved in some way or if technology has advanced to the extent that it arguably could compensate for a hearing or vision deficiency.

*Id.* App. D.

**B.  Union Pacific's Color Vision Testing**

For its primary color vision test, Union Pacific uses the Ishihara 14-plate test, one of the pseudoisochromatic plate tests listed in Appendix D. For its secondary test, Union Pacific uses a CVFT. This is a proprietary field test, developed by Union Pacific, as per the FRA.

Union Pacific had a CVFT that it had used since 1999, using actual wayside signals. *See* ECF 50-2 at 31. This test involved Union Pacific presenting conductors with ten wayside signal configurations in a preset order. *Id.* at 30-31. In June 2012, two Union Pacific freight trains collided head-on in Goodwell, Oklahoma, killing two engineers and one conductor, derailing five locomotives and 32 cars, and causing about $14.8 million in damages. *See, e.g.*, *id.* at 8. Ultimately, the National Transportation Safety Board ("NTSB") concluded that the accident was in part because of an engineer who had color vision deficiencies that had grown over time and were not sufficiently detected by Union Pacific's then-CVFT. *Id.* at 52-53. The engineer had failed the Ishihara test but passed Union Pacific's then-CVFT. The NTSB determined that Union Pacific's CVFT at the time "fails to ensure that [Union Pacific] employees have adequate color perception to perform in safety-sensitive positions." *Id.* at 31. The NTSB recommended that Union Pacific "replace its color vision field test with a test that has established and acceptable levels of validity, reliability, and comparability to ensure that certified employees in safety-sensitive positions have sufficient color discrimination to perform safely." *Id.*

The NTSB also noted that federal regulations lacked specificity with respect to the railroads' secondary field testing and concluded allowing that discretion created safety risks. *Id.* at 32. The NTSB recommended that the FRA define what constitutes a "valid, reliable, and comparable field test procedure for assessing the color discrimination capabilities of employees in safety-sensitive positions." *Id.*

In response, the FRA issued an "interim interpretation to clarify provisions in its locomotive engineer and conductor qualification and certification regulations with respect to vision standards and testing." *Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors*, 80 Fed. Reg. 73122, 73122  (Nov. 24, 2015) ("Best Practices"). The Best Practices provide "guidance for designing valid, reliable, and comparable vision field tests for assessing whether persons who do not meet those thresholds can perform safely as locomotive engineers and conductors." *Id.* This guidance reaffirms that FRA "rules grant railroad medical examiners discretion in determining the methods and procedures the medical examiner will use to further evaluate persons who do not meet the vision thresholds in 49 CFR 240.121(c) and 242.117(h)." *Id.* at 73124. The Best Practices then explains that field tests are different from scientific tests, such as the Ishihara. *Id.* at 73124-25. Scientific tests are validated through scientific rigor, peer review, and the like. *Id.* at 73124. Field tests should be "valid, reliable, and comparable" and must "reasonably match actual operating or working conditions." *Id.* For validity, "a color vision field test is valid to the degree that it assesses whether a person can recognize and distinguish between colors of the types of railroad signals in the yard or on all portions of railroad systems on which the person must perform safely." *Id.* at 73125. This factor essentially tests "[t]he degree to which a field test's conditions match actual operating conditions." *Id.* "Reliability means the degree of reproducibility of the test results. . . .

Comparability means the testing procedures are fairly administered and the test results are uniformly recorded." *Id.*

After the Goodwell accident, Union Pacific developed a new CVFT, the Light Cannon. Union Pacific began developing the Light Cannon test in 2015. The original device contained four eight-inch LED lights, with a row of two on each opposing side, that each flashed one of four colors—red, yellow, green, and white—for five seconds each. *See* ECF 52-8. At the request of Union Pacific, this device and testing protocol was reviewed and evaluated by Drs. Jeff Rabin and Douglas J. Ivan in October 2015. *Id.* Drs. Rabin and Ivan issued their findings in January 2016. *Id.* They recommended several changes, including reducing the time shown for each color to two seconds, automating the exposure time, increasing the distance between the examinee and the device to one-half mile, changing the device from rows of two on two sides to a rotatable cube with one light on each of four sides, and conducting human studies to validate the efficacy of the test. *Id.*

The report by Drs. Rabin and Ivan also stated that the test had "a number of critical short comings in its current design and within the proposed test administrative procedures." *Id.* at 4. The report "strongly recommended" that before relying on "any CVFT" and "particularly" the Light Cannon test, it "undergo proper scientific and operational validation studies." *Id.* at 5. This is because "practical field color vision tests are problematic and not recommended." *Id.*

Union Pacific implemented several of the proposed changes. It changed the design to a rotating cube with one color on each side. Holland Dep. Tr. 35:9-37:10 (ECF 52-5 at 11-13).[4] It reduced the exposure time to three seconds and automated the exposure. *Id.*; *see also* Doerr Dep.

---

[4] This is the deposition of Union Pacific's medical examiner, Dr. John Holland.

Tr. 93:18-94:18 (ECF 52-6 at 8-9). Union Pacific did not, however conduct any human studies or perform any other validation of the Light Cannon. It implemented the test in April 2016.

In late October 2016, Union Pacific hired Drs. Rabin and Ivan to review the Light Cannon, in part because of "formal and informal complaints lodged by Union Pacific employees who have failed the Color Vision Field Test." ECF 52-11, 52-12. This review, however, was minimal. Dr. Ivan testified that it involved creating an outline for an eventual final report, including preparing for the input of data, such as luminescence measurements, but did not result in any written report at the time. *See* Ivan Dep. Tr. 128:10-24 (ECF 52-4 at 19). Dr. Rabin testified in the similar case of *Walker v. Union Pacific*, that he recalled that engagement involved one visit to Union Pacific's Texas facility to review the new Light Cannon device and taking some measurements. *Walker*, December 13, 2024, *Daubert* Hearing Tr., 119:12-23 (3:22-cv-1011-SI, ECF 152).

Union Pacific did not conduct human studies at this time. For example, Union Pacific did not test the Light Cannon's efficacy for persons with and without color vision deficiencies. Nor did Union Pacific test persons with and without color deficiencies and compare the Light Cannon to real wayside signals to determine how well the Light Cannon matches real operating conditions, or conduct some other test to make that comparison.

Eventually, in 2018, Union Pacific again hired Dr. Rabin to conduct further studies to evaluate the efficacy of the Light Cannon. In 2019 and 2020, Dr. Rabin conducted studies with his graduate students on color vision normal persons and color vision impaired persons. *See* ECF 52-15. They compared Union Pacific's "original" testing protocol,[5] with a modified testing

---

[5] Dr. Rabin identified Union Pacific's original testing protocol as its "2019" protocol, as compared to Dr. Rabin's proposed new "2020" protocol.

protocol. Union Pacific's original testing protocol was to show the examinee the same color, twice, to orient him or her before the test. *Id.* at 3. The modified protocol was to show the examinee all four colors before the test. Union Pacific's original protocol had a 26.5 percent failure rate in persons known to have no color vision deficiency. *Id.* With the modified protocol, this failure rate dropped to nearly zero. *Id.* at 5.

## C. DeFries's Employment History

DeFries worked for Union Pacific as a conductor and brakeman from July 2004 until March 2018. The essential duties of his job included: "Observe and respond to variety of wayside and cab signals which include color light signals[.]" ECF 50-1 at 3. He took his first Ishihara test in 2004. Union Pacific argues that the result is unclear because the "pass" circle is filled in completely and the "fail" circle is marked with an "X." *See* ECF 50-13 at 7. Above those markings, however, the test indicates: "record color vision result" and the "normal" circle is filled in. *See id.* The "abnormal" circle is unmarked and the trailing comments for abnormal results also are unmarked. Thus, the evidence supports that DeFries passed his first Ishihara. He next took an Ishihara test in 2009, and he failed the test. *See* DeFries Dep. Tr. 48:15-49:3 (ECF 50-11 at 10-11). He also failed Ishihara tests in March 2012 and March 2015. *See* ECF 50-14, 50-15. Each time he passed Union Pacific's previous iteration of its CVFT.

On March 29, 2018, DeFries took and failed his next routine Ishihara test. *See* ECF 50-17. He was restricted from duty pending completion of his CVFT. *See* ECF 50-18 (pages two and three of work restriction); *see also* ECF 50-16 at 7 (page one of similar work restriction from 2015 when he failed the Ishihara). This time the CVFT test was the Light Cannon. He took and failed the Light Cannon on May 10, 2018. ECF 50-19. He appealed the results, arguing that testing conditions affected his results. He was allowed to retake the test. He retook and again failed the Light Cannon on July 11, 2018. ECF 50-20. The testing protocol used

for DeFries's Light Cannon tests was the "original" protocol—to show him two of the same lights before the test. *See* ECF 50-19 at 2, 50-20 at 5. After DeFries's second Light Cannon failure, Union Pacific's medical examiner, Dr. John Holland, concluded that DeFries had a "color vision deficit," was "not fit for duty," and his condition could not be accommodated. ECF 52-21. Thus, his temporary work restriction became permanent.

## DISCUSSION

### A.  Motion to Dismiss

Union Pacific argues that DeFries's claim under the ADA is "nothing more than a challenge to the denial of his locomotive [conductor] recertification, a challenge for which Congress reserved exclusive jurisdiction to the court of appeals to review under the Hobbs Act." Union Pacific points out that the color vision acuity standards and certification process for train conductors are established through FRA regulations. *See, e.g.*, 49 C.F.R. §§ 242.101(a)(3), 117, App. D. The regulations vest discretion in the railroad's medical examiner to develop secondary field testing and evaluate conductors who undergo secondary testing. *See* 49 C.F.R. §§ 242.117(j), App. D(4); Best Practices, 80 Fed. Reg. at 73123-24. Union Pacific asserts that the decision to deny DeFries's conductor certification was made by Dr. Holland because he concluded that DeFries could not meet FRA color vision acuity standards.

FRA regulations also include an administrative appeal process. The regulations provide:

> Any person who has been denied certification, denied recertification, or has had his or her certification revoked and believes that a railroad incorrectly determined that he or she failed to meet the certification requirements of this regulation when making the decision to deny or revoke certification, *may* petition the Federal Railroad Administrator to review the railroad's decision.

49 C.F.R. § 242.501(a) (emphasis added).

Union Pacific contends that this provision *requires* that any employee *must* exhaust administrative remedies for any claim relating to certification. Union Pacific argues that combining this provision with the Hobbs Act's requirement that challenges to final agency action must be brought in the court of appeals means that DeFries cannot evade the reach of the Hobbs Act by failing to file the required administrative review and then asserting that he did not obtain a final agency action.

The Court agrees that if DeFries's claim is the type of claim that falls under the Hobbs Act, he cannot avoid those jurisdictional requirements by failing to use the administrative appeals process and obtaining a final agency decision and then arguing that he has no final agency action to trigger coverage under the Hobbs Act. *See, e.g.*, *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833-34 (1976) ("It would require the suspension of disbelief to ascribe to Congress the design to allow its careful and thorough remedial scheme to be circumvented by artful pleading. . . . [A] precisely drawn, detailed statute pre-empts more general remedies."). There are, however, two errors with Union Pacific's contention that administrative review under the FRSA's implementing regulations trumps a claim under the ADA.

The first flaw in Union Pacific's argument is that the plain text of the FRA regulations do not *require* administrative review. The regulations provide that an employee "may" file a petition with the FRA. 49 C.F.R. §§ 242.501(a) (conductors); 240.401(a) (engineers); *see also Carpenter*, 432 F.3d at 1031 ("The regulations were not designed to affect the relationships between railway companies and their labor force. *See, e.g.*, 49 U.S.C. § 20110; 49 C.F.R. §§ 240.1(a), 240.5(c)-(f). Despite this focus, Subpart E of 49 C.F.R. Part 240 establishes a *limited* three-level dispute resolution mechanism in which a person denied engineer certification *may* obtain a fresh determination by the FRA of whether a railroad's decision was correct. *See* 49

C.F.R. §§ 240.401-240.411." (emphasis added)). The FRA knew how to instruct that a person "must" or "shall" engage in conduct when drafting the implementing regulations. *See, e.g.*, 49 C.F.R. § 242.117(a) ("Each railroad *shall* adopt and comply with a program which complies with the requirements of this section." (emphasis added)). The FRA easily could have instructed that an employee "shall" file a petition with the FRA under certain circumstances if that was intended to be the only option available to employees challenging certification decisions. The FRA chose not to use such absolute language in this provision. Indeed, the Ninth Circuit in *Carpenter* repeatedly emphasized the "limited" scope of and lack of remedial relief available in the FRA administrative process and described several alternatives available to railroad employees "wrongly denied engineer certification," including a claim under the Railway Labor Act and claims under a collective bargaining agreement or at common law. *See, e.g.*, *Carpenter*, 432 F.3d at 1034-35. The Ninth Circuit's express description that an employee wrongly denied engineer certification had avenues other than FRA administrative appeals directly contradicts Union Pacific's argument to the contrary here.

Because the FRA administrative review provision is not mandatory, it means that DeFries's failure to file an administrative appeal does not implicate the Court's jurisdiction because it does not implicate the court of appeals' future jurisdiction. *Cf. Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 626 (9th Cir. 1985) (holding "that where a statute commits review of final agency action to the court of appeals, any suit seeking relief that might affect the court's future jurisdiction is subject to its exclusive review"). DeFries had the option of administratively appealing to the FRA, but he also had the option of bringing other types of legal challenges. *See, e.g.*, 49 C.F.R. § 242.5(d) ("Nothing in this part shall be deemed to abridge any additional procedural rights or remedies not inconsistent with this part that are available to the

employee under a collective bargaining agreement, the Railway Labor Act, or (with respect to employment at will) at common law with respect to removal from service or other adverse action taken as a consequence of this part."); *Carpenter*, 432 F.3d at 1035.

The second flaw in Union Pacific's argument is that Union Pacific contends that the FRSA precludes a claim under the ADA. It does not. Although the FRSA aspires for national uniformity in railroad safety "to the extent practicable," it only expressly preempts *state* law. *See* 49 U.S.C. § 20106(2); *Tufariello v. Long Island R.R.*, 458 F.3d 80, 86 (2d Cir. 2006). For two federal statutes, "courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Although Union Pacific states that it does not argue "preemption," it does not offer a persuasive argument for preclusion.

In enacting the FRSA, Congress did not clearly express an intent to preclude ADA claims. Indeed, the two statutes have different purposes that can work harmoniously—the FRSA is focused on railroad safety and the ADA protects against discrimination of persons with actual or perceived disabilities. *Cf. Vann-Foreman v. Illinois Cent. R.R. Co.*, 2022 WL 180749, at *4 (N.D. Ill. Jan. 20, 2022) ("The subject matter of Title VII is discrimination. It is not a safety statute. Thus, Title VII and the FRSA address different subject matters entirely. Consequently, the court concludes that the FRSA does not preempt Title VII and plaintiff was not required to exhaust any available remedies under the FRSA." (citation omitted)); *Weeks v. Union Pac. R.R. Co.*, 2017 WL 1740123, at *7 (E.D. Cal. May 4, 2017) ("Further, the subject matter of the FEHA and the ADA is discrimination. As relevant here, the subject matter of the FRSA and 49 C.F.R. Part 240 is the criteria for ensuring that safe and qualified individuals operate locomotives. The

ADA and FEHA are not safety statutes or regulations. The FRSA and the ADA/FEHA address different subject matters entirely." (citations omitted)); *Earwood v. Norfolk S. Ry. Co.*, 845 F. Supp. 880, 885 (N.D. Ga. 1993) ("The Court concludes that Plaintiff's FELA claims are not precluded by F.R.S.A. The two statutes do not purport to cover the same areas. . . . There is clearly no 'intolerable conflict' between the two statutes.").

As the Southern District of New York explained, in finding that claims under the Federal Employers Liability Act ("FELA") were not precluded by the FRSA,

> The Court concludes that it must not rewrite the express statutory language of the FRSA by inferring that its regulations preclude covered federal claims under the FELA, in addition to covered state law claims. . . .
>
> A different conclusion is not warranted by the FRSA's vague directive that "[l]aws, regulations, and orders related to railroad safety ... shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). This provision must be read in the context in which it appears: a section of the statute exclusively addressing the preemption of state law.
>
> . . . .
>
> Finally, were there any lingering doubts as to how the Supreme Court would resolve this issue, those doubts are eliminated by the Supreme Court's recent decision in *POM Wonderful LLC v. Coca–Cola Co.*, 573 U.S. 102 (2014).

*Henderson v. Nat'l R.R. Passenger Corp.*, 87 F. Supp. 3d 610, 616, 619 (S.D.N.Y. 2015). The *Henderson* court described the Supreme Court's unanimous holding in *POM Wonderful*, with its similar underlying statute's specific preclusion of state law and not federal law, heavily regulated industry, and the goal of "national uniformity." *Id.* at 619-21. The court in *Henderson* found *POM Wonderful* to be persuasive authority, and concluded that the FRSA and FELA were complementary statutes and that the FRSA did not preclude FELA. *Id.* at 621.

The Court finds *Henderson* persuasive authority and although it involved FELA, there is even less reason for the FRSA to preclude the ADA than to preclude FELA. The ADA focuses on disability discrimination, whereas FELA focuses on the safety of railroad employees, so it arguably has more overlap with the FRSA.

The Court also agrees with the court in *Henderson* that *POM Wonderful* provides persuasive authority. In that case, POM Wonderful sued the Coca-Cola Company ("Coca-Cola") under the false advertising provision of the Lanham Act over one of Coca-Cola's fruit juice products, and the district court concluded that the claim was precluded under the Food, Drug, and Cosmetic Act ("FDCA"). *POM Wonderful*, 573 U.S. at 110. The FDCA prohibits the misbranding and mislabeling of food and drink and authorizes the Food and Drug Administration to promulgate regulations regarding food and drink labeling, including the labeling of mixes of different types of juice into one juice blend. *Id.* at 108. The FDCA preempts certain state laws on misbranding but does not refer to federal laws. *Id.* at 109 (citing 21 U.S.C. § 343-1(a)).

In *POM Wonderful*, the Ninth Circuit affirmed the district court but the Supreme Court reversed. The Supreme Court explained that the FDCA expressly preempted state laws but did not mention federal laws. *Id.* at 114. The Court then emphasized: "By taking care to mandate express pre-emption of some state laws, Congress if anything indicated it did not intend the FDCA to preclude requirements arising from other sources. Pre-emption of some state requirements does not suggest an intent to preclude federal claims." *Id.* (citation omitted). The Supreme Court also concluded that "[t]he structures of the FDCA and the Lanham Act reinforce the conclusion drawn from the text" because "[t]he Lanham Act and the FDCA complement each other in major respects, for each has its own scope and purpose." *Id.* at 115. Statutes complement each other when they "impose 'different requirements and protections.'" *Id.* (quoting *J.E.M. Ag*

*Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001)). The Supreme Court

pointed out that "[w]hen two statutes complement each other, it would show disregard for the

congressional design to hold that Congress nonetheless intended one federal statute to preclude

the operation of the other." *Id.*

The Supreme Court rejected Coca-Cola's argument that the FDCA's goal of "national

uniformity" in labeling and branding supported preclusion of the Lanham Act claim. The Court

explained:

> it is far from clear that Coca-Cola's assertions about national
> uniformity in fact reflect the congressional design. Although the
> application of a federal statute such as the Lanham Act by judges
> and juries in courts throughout the country may give rise to some
> variation in outcome, this is the means Congress chose to enforce a
> national policy to ensure fair competition. It is quite different from
> the disuniformity that would arise from the multitude of state laws,
> state regulations, state administrative agency rulings, and state-
> court decisions that are partially forbidden by the FDCA's pre-
> emption provision. Congress not infrequently permits a certain
> amount of variability by authorizing a federal cause of action even
> in areas of law where national uniformity is important.

*Id.* at 117.

Similar issues are present here. The ADA and FRSA complement each other because

they impose different requirements and protections. They each have their own scope and purpose

and can operate in tandem. Congress focused on national uniformity for the FRSA by

preempting state law but allowed "a certain amount of variability by authorizing a federal cause

of action" even though national uniformity is important to railroad safety. *See id.* The application

of a federal statute like the ADA would not result in the "disuniformity that would arise from the

multitude of state laws, state regulations, state administrative agency rulings, and state-court

decisions." *See id.*

PAGE 19 – OPINION AND ORDER

Further, DeFries's discrimination claims under the ADA do not give rise to concerns requiring preclusion. DeFries challenges Union Pacific's discretionary Light Cannon test as discriminatory. "Union Pacific has discretion under the federal regulations to develop and administer follow-up color-vision tests to those who fail the Ishihara. But that discretion must be exercised within the limits of the ADA." *See Mills v. Union Pac. R.R. Co.*, 2024 WL 185246, at *9 (D. Idaho Jan. 16, 2024). DeFries is not challenging the FRA regulations or an FRA decision. Absent Union Pacific's rejected argument that DeFries was required to file an appeal with the FRA and create a final agency action, Union Pacific offers no credible argument that DeFries is making a challenge related to the FRA. "This is not a case where a lawsuit is undermining an agency judgment, and in any event the [FRA] does not have authority to enforce the [ADA]." *See POM Wonderful*, 573 U.S. at 120.

Union Pacific cites several cases to support its argument that this case falls under the Hobbs Act. The first is *Daniels v. Union Pacific Railroad Co.*, 530 F.3d 936 (D.C. Cir. 2008). In *Daniels*, locomotive engineers sued Union Pacific, the Locomotive Engineer Review Board ("LERB"), and the FRA after Union Pacific revoked the "Class I" licenses of seven locomotive engineers without a hearing. *Id.* at 937-38. The plaintiffs argued that this violated an FRA regulation, 49 C.F.R. § 240.307(b), which establishes that before *revoking* a license upon recertification, a railroad must provide notice and the opportunity to be heard. *Daniels*, 530 F.3d at 938-39. After Union Pacific's conduct, Daniels petitioned the LERB for review, which concluded that the case was governed by FRA regulations, and found that Union Pacific did not need to provide a hearing for the alleged conduct. *Id.* at 939. Daniels appealed the LERB's decision to the FRA and lost. *Id.* Daniels then sued all three defendants in federal district court, alleging violations of his Fifth Amendment right to due process. The D.C. Circuit concluded that

the two causes of action naming the LERB and the FRA sought review of final agency action—

the petition for review before the LERB, regardless of whether the engineers had exhausted their

administrative appeals. *Id.* at 941-42. Thus, the D.C. Circuit held that the court of appeals had

exclusive jurisdiction over those claims and the district court did not have subject matter

jurisdiction over those claims. *Id.*

The D.C. Circuit then evaluated the claim brought against only Union Pacific, which

alleged that Union Pacific failed to "provide a prior hearing or prompt post deprivation hearing

to determine if there is the basis for revocation of a Class I certificate under federal regulations."

*Id.* at 942 (quotation marks omitted). The circuit court held that this count also was a challenge

to the actions of the LERB and the FRA, because Union Pacific's denial of a hearing was based

on its interpretation of § 49 C.F.R. § 240.307(b), an interpretation that the FRA had upheld. *Id.*

The court concluded that to obtain the requested relief,

> the plaintiffs must challenge the FRA's *interpretation* of its
> regulations as well as Union Pacific's *application* of the
> regulations. Otherwise, the plaintiffs are circumventing review of
> the FRA's regulations in this Court (provided for by the Congress
> under the Hobbs Act) by instead indirectly—in Count I—seeking
> review of the regulations in district court.

*Id.* (emphasis in original). The court also noted a demotion was essentially a revocation, which is

subject to a three-tiered administrative review, and constitutes a challenge to the FRA. *Id.* at 943.

*Daniels* is distinguishable because although the claim purportedly was against only

Union Pacific for its conduct, it actually involved procedural conduct that *already had been*

ratified by the FRA. Thus, it was deemed agency conduct because it was Union Pacific's

interpretation of an FRA regulation that the FRA already had ratified. Thus, it equated to Union

Pacific's application of the FRA's interpretation of its regulation. There is no such agency

conduct here. There is no evidence that the FRA evaluated the Light Cannon test for any

discriminatory effects and ratified its efficacy. To the contrary, the regulations show that field

testing is left to the railroad's discretion. The fact that the FRA may have approved Union

Pacific's certification program does not make use of the Light Cannon test a federal agency

action. Nor did DeFries invoke his voluntary administrative appeal process and obtain an agency

opinion.

Union Pacific next cites *Brotherhood of Locomotive Engineers & Trainmen v. Federal

Railroad Administration* ("*BLET*"), 972 F.3d 83 (D.C. Cir. 2020). In *BLET*, the D.C. Circuit held

that it had jurisdiction under the Hobbs Act to hear the challenge by labor unions to the FRA's

approval of a materially altered engineer certification program. *Id.* at 99 ("As to the question of

finality, the Railroad Administration's approval of Kansas City Railway's revised engineer

certification program is a final agency action reviewable under the Hobbs Act."). *BLET* is

distinguishable because it was a challenge directed to the FRA based on its action approving a

railroad's certification program. It has no similarity to the facts of this case, other than generally

reciting the background of the FRA and its regulations.

Union Pacific also cites *Carpenter v. Department of Transportation*, 13 F.3d 313 (9th

Cir. 1994). In that case, a truck driver with monocular vision had been a licensed driver for 31

years. *Id.* at 314. Then the Federal Highway Administration ("FHWA") discovered his vision

issues and disqualified him from driving in interstate commerce because he did not satisfy the

agency's vision acuity standards. *Id.* Carpenter filed an administrative appeal against the agency,

and after that was denied, he filed suit against the FHWA in federal district court under the

Rehabilitation Act. *Id.* The Ninth Circuit concluded that the claim against the FHWA (part of the

DOT) challenging its regulations must be brought in the court of appeals under the Hobbs Act.

*Id.* at 315-16. The court warned against "artful pleading" to frame a challenge to DOT

regulations as a civil rights case. *See id.* at 316 ("It would be inconsistent with this intent to allow those who wish to challenge DOT regulations the opportunity to avoid the jurisdictional and time limitations of the Hobbs Act by simply invoking the Rehabilitation Act and adding damages to their complaint."). This case is distinguishable because DeFries is not suing a federal agency and is not challenging FRA regulations, directly or indirectly.

The fourth case cited by Union Pacific is *Kirkingburg v. Albertson's, Inc.*, 143 F.3d 1228 (9th Cir. 1998), *as amended* (July 1, 1998), rev'd, 527 U.S. 555 (1999). In *Kirkingburg*, the Ninth Circuit did not reach the Hobbs Act question because it was not addressed by the parties. *Id.* at 1236. The court noted in dicta, however, that it "seriously question[ed] [its] jurisdiction" to adjudicate the plaintiff's relevant argument because it doubted "a business that operates in the highly regulated commercial transportation industry is free to challenge generally applicable FHWA regulations in private litigation." *Id.* This was because "[t]he practical effect of Albertson's argument is to seek to have us declare the waiver program invalid." *Id.* This case has no application here because DeFries is not asking this Court to declare any aspect of the FRA invalid or to make a decision that would have the practical effect of invalidating any portion of the FRA.

The next case cited by Union Pacific is *Bonneville Power*. As noted, in *Bonneville Power*, the Ninth Circuit explained that when a circuit court has exclusive jurisdiction over final agency action, if the resolution of the claims before the district court "could affect the [circuit] court's future jurisdiction over final agency action," then the district case was subject to the circuit court's exclusive jurisdiction. 767 F.2d at 626. DeFries has filed an ADA claim and is seeking money damages and injunctive relief to preclude Union Pacific from continuing to engage in discriminatory conduct. At this time, Union Pacific fails to show that the relief sought

in this case could affect the circuit court's jurisdiction such that jurisdiction in this Court is

barred.

The final case cited by Union Pacific is *Turner v. BNSF Railway Co.*, 2023 WL 9052248

(N.D. Tex. Dec. 22, 2023). The plaintiff in *Turner*, like DeFries, failed his Ishihara test. Turner's

claim stemmed from the argument that the railroad's secondary field test was insufficient under

FRA guidelines and served to discriminate against him. *See id.* at *2. The *Turner* court did not

mention the Hobbs Act, but concluded that the FRSA precluded the ADA claim because of the

administrative review option in 49 C.F.R. § 242.501(a). *Id.* at *2. The court in *Turner* rejected

the contention that the ADA and the FRSA could co-exist harmoniously, stating: "If conductors

were permitted to challenge a railroad's testing criteria for recertification under the ADA, it

would have the untenable result of making the railroad safety regulations established under the

FRSA virtually meaningless." *Id.* at *3 (quotation marks omitted). The court continued,

explaining that "[t]he FRA's 'specific, detailed scheme setting out dispute resolution procedures'

on this issue would be pointless and the FRSA's purpose of protecting public health and safety

would be undermined." *Id.* (quoting *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 261 (8th

Cir. 1996)). The *Turner* court explained that

> When an employee is not attempting to challenge the substance of
> the railroad's certification program or the actual decision to deny
> recertification," the employee may state a claim under the ADA.
> But in this case, where FRA regulations specifically govern the
> sufficiency of an employee's recertification testing criteria, an
> employee cannot challenge the railroad's testing protocol under the
> ADA. Such a claim is precluded by the FRA's "comprehensive
> administrative adjudication system for handing certification
> disputes." *See Peters*, 80 F.3d at 262.

*Id.* (cleaned up).

The Court respectfully disagrees with *Turner*. The *Turner* court did not discuss the

meaning of the FRA regulation's use of the word "may" in the administrative appeal provision.

The court in *Turner* also did not mention the regulation's provision expressly preserving other legal challenges. Nor did the court distinguish between analyzing state law preemption (like the Eighth Circuit did in *Peters*) and federal law preclusion. The court in *Turner* relied on and applied the reasoning of state court FRSA preemption cases, particularly *Peters*, but the analysis is different for federal law preclusion. The court also did not mention *POM Wonderful* or the fact that Congress specifically preempted state law but not federal law in the FRSA. Most importantly, the Northern District of Texas is not within the Ninth Circuit, which has the guidance of *Carpenter*. *Carpenter* explains the *limited* reach of the administrative review within the FRSA and specifically states that employees "wrongly denied engineer [and conductor] certification" *do* have legal recourse other than the administrative review process. *See Carpenter*, 432 F.3d at 1034-35. This is the exact opposite of the conclusion reached by the court in *Turner*. 2023 WL 9052248, at *3 ("To the extent a conductor believes they have been improperly denied recertification, their recourse is with the FRA, not under the ADA.").

## B.  Motion for Summary Judgment

Union Pacific moves for summary judgment, arguing first that DeFries cannot meet his burden to make a prima facie case because he cannot show that he is a "qualified" individual under the ADA. Union Pacific then raises three affirmative defenses. The first asserts that Union Pacific was following binding federal regulations, similar to the Supreme Court's decision in *Albertson's*. The next two rely on the statutory affirmative defenses set forth in 42 U.S.C. § 12113, known as "business necessity" and "direct threat."

### 1.  Qualified Individual

Under the ADA an individual is "qualified" if, "with or without reasonable accommodation, [the individual] can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Ninth Circuit follows a two-

step inquiry to determine whether an individual is qualified for a position. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007). First, a court "examines whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the position." *Id.* (quotations marks omitted). Second, a court "considers whether the individual can perform the essential functions of such position with or without a reasonable accommodation." *Id.* (quotation marks omitted). "Essential functions are not to be confused with qualification standards, which an employer may establish for a certain position. Whereas essential functions are basic duties, qualification standards are personal and professional attributes that may include physical, medical, and safety requirements." *Id.* (cleaned up).

Union Pacific argues that DeFries cannot show that he is a qualified individual because he cannot perform the essential functions of his job—meaning he does not meet the second prong of the test. Union Pacific argues DeFries fails this prong because he failed his Ishihara test and both Light Cannon tests and therefore he cannot show that he can be certified for color vision acuity as required under FRA regulations.

The *Mills* court rejected a similar argument by Union Pacific under factually similar circumstances. *See Mills*, 2024 WL 185246, at *10. The court in *Mills* first found that "federal regulations do not require use of the Light Cannon." *Id.* at *6. The *Mills* court thus characterized the Light Cannon as a "qualification standard" and not an "essential function." *See, e.g.*, *id.* at *9-10, 13. The court in *Mills* rejected Union Pacific's argument that failing the Light Cannon, which was "necessary to meet the essential functions of the job of conductor," resulted in the plaintiff failing to be a qualified individual, quoting *Bates* in explaining:

> The circuit court elaborated that "it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.*

> (emphasis in original). While this statement expressly applies to
> the second prong of the qualified individual analysis, the logic
> holds true for the first prong as well. It would make no sense for
> the Court to hold that Mills has failed to meet the prerequisites for
> conducting trains simply because he failed the test he is currently
> challenging.

*Id.* at *10 (quoting *Bates*, 511 F.3d at 990). The *Mills* court found that based on this policy and

the plaintiff's history of job performance without difficulty and passing the old CVFT test after

failing the Ishihara, issues of fact existed as to whether the plaintiff was able to perform the

essential functions of his job. *Id.*

Union Pacific relies on *Turner*, which found that the plaintiff was not a qualified

individual because the plaintiff did not have a certification and did not seek administrative

review of that certification decision. *Turner*, 2023 WL 9052248, at *4. The court in *Turner* relied

on a Fifth Circuit opinion, *Williams v. J.B. Hunt Transport, Inc.*, which had held that a plaintiff

could not raise an ADA claim without having exhausted the DOT's administrative appeals

process under 49 C.F.R. § 391.47. 826 F.3d 806, 812 (5th Cir. 2016). The Ninth Circuit,

however, has not so held. Indeed, *Carpenter* supports a contrary conclusion.

The Court finds *Mills* more persuasive than *Turner*. *Mills* relies on the Ninth Circuit's

discussion in *Bates*. The Court finds that underlying reasoning persuasive. It makes little sense to

find that a plaintiff who is challenging a particular test, protocol, or standard as discriminatory

because it screens out persons with perceived disabilities like the plaintiff, cannot be a qualified

individual because they failed the very test they are challenging as deficient under the ADA.

Taking the failure to be certified off the table, DeFries offers sufficient evidence to create

an issue of fact as to whether he is a qualified individual. He passed DOT color vision tests every

three years, including in 2021. *See* ECF 52-22; DeFries Dep. Tr. 16:25-17:11 (ECF 52-18 at

4-5). He also provides the expert medical opinion of Dr. Jay Neitz, who reviewed DeFries's

medical records and color vision tests, and opines that he has sufficient color vision acuity to safely perform his job as conductor. Neitz Op. at 10-11 (ECF 52-1). The latter testing and medical opinion distinguishes this case from *Blankinship v. Union Pacific Railroad Co.*, 2024 WL 5187689 (D. Ariz. Dec. 20, 2024). In *Blankinship*, the court found that the plaintiff was not qualified to perform the essential functions when the plaintiff offered nothing other than historical performance and old CVFT results (although those two items alone were found sufficient in *Mills*).[6] *Id.* at *5-6. Here, DeFries provides the additional DOT vision testing and the medical expert opinion.

### 2. *Albertson*'s Defense

Union Pacific argues that it "has an absolute defense to an ADA claim if an action is 'required or necessitated by another Federal law or regulation.'" ECF 49 at 25 (quoting 29 C.F.R. § 1630.15(e) and citing *Albertson's*, 527 U.S. 555). Union Pacific contends that its actions were protected as a matter of law because they were undertaken pursuant to binding FRA regulations.

There is no dispute that DeFries was required under FRA regulations to take a primary color vision test and that the Ishihara is one of the approved tests listed in the FRA regulations. Nor is there any dispute that the regulations allow for secondary testing when a conductor fails the primary test and that the railroad has discretion as to the type of secondary testing to implement. One type of secondary testing is a field test. Again, the railroad has discretion under

---

[6] DeFries also provides similar historical evidence as the plaintiffs in *Mills* and *Blankinship*—that DeFries performed his job without problem for 14 years and passed the old CVFT several times. That is support that he historically could perform the essential functions of his job, including the color vision aspects of the job. It is additional evidence a reasonable juror could consider along with the expert evidence and more recent vision testing as to whether DeFries could perform those functions in 2018.

the regulations to create a field test. The field test, however, should be "valid, reliable, and comparable" to what a conductor would see in the field. *See* Best Practices, 80 Fed. Reg. at 73124 ("Although FRA's rules grant discretion to railroads in selecting a test protocol, FRA's longstanding interpretation of this provision is that the test offered by a railroad must be a valid, reliable, and comparable test for assessing whether a person who fails an initial vision test can safely perform as a locomotive engineer or conductor.").

DeFries argues that Union Pacific's discretionary Light Cannon test serves to screen out persons like DeFries who are *perceived* as color vision deficient (and thus are "disabled" under the ADA) but *can* perform the essential functions of their job. DeFries contends that the Light Cannon does so because it is *not* a valid, reliable, and comparable field test. DeFries provides sufficient evidence creating a fact dispute on both of these points. As discussed above, he provides evidence creating an issue of fact that he can perform the essential functions of his job (*i.e.*, that he is qualified). He also provides evidence creating an issue of fact about the efficacy of the Light Cannon as given to DeFries and whether it screens out persons with perceived color vision deficits. This includes a report by Union Pacific's reviewing experts criticizing the original Light Cannon test that was only partially modified and had no human studies before DeFries was tested, Dr. Rabin's 2020 study report showing that the test as given to DeFries had a 26.5 percent failure rate for color vision normal persons, Dr. Neitz's expert testimony regarding DeFries's color vision acuity, and the DOT color vision test that DeFries passed in 2021. The *Albertson's* defense, thus, turns on whether binding FRA regulations require testing with the Light Cannon.

The FRA regulations do not require that Union Pacific *use the Light Cannon* test as a secondary test. Indeed, they do not require that Union Pacific even use a field test as a secondary

test. This is unlike the situation in *Albertson's*. As explained by the court in *Mills* in rejecting this

same argument by Union Pacific,

> The problem with this line of reasoning is that the regulation in
> *Albertson's* provided a single, clear, substantive standard for the
> visual acuity of truck drivers in interstate commerce. *See* 49 C.F.R.
> § 391.41(b)(10) (1998). That regulation contained no field test
> provision, and certainly did not allow employers to choose how to
> evaluate the visual acuity of drivers. If a driver's vision fell below
> the standard, the driver simply could not drive unless he or she
> obtained a waiver and his or her employer chose to recognize the
> waiver.
>
> The safety regulations here are not the same. *See* 49 C.F.R. § 240,
> App. F. Appendix F provides initial standards on which railroad
> companies can rely in detecting problematic color blindness—the
> Ishihara or other similar color-vision tests. *Id.* But, as previously
> discussed, an employee who falls short of those standards is not
> left without recourse. Subsection 4 of Appendix F affords railroad
> companies broad discretion in conducting further evaluation of the
> color vision of their employees. *Id.* at App. F(4) ("An examinee
> who fails to [pass the listed color-vision tests], may be further
> evaluated as determined by the railroad's medical examiner.
> Ophthalmologic referral, field testing, or other practical color
> testing may be utilized depending on the experience of the
> examinee.").
>
> With the discretion afforded by Appendix F, Union Pacific created
> the Light Cannon, and used it to test Mills' color vision after he
> failed the Ishihara. In other words, *unlike* Albertson's, Union
> Pacific has insisted upon a job qualification of its own devising.
> And because reliance on the Light Cannon is not required by
> federal regulations, its use may be subject to questions about its
> appropriateness and justifiable application to Mills.

*Mills*, 2024 WL 185246, at *10-11 (emphasis and alterations in original) (*Mills* cites § 240,

Appendix F, which contains the same information as § 242, Appendix D, but applied to

engineers instead of conductors). Thus, the *Albertson's* defense does not apply as a matter of law

to shield Union Pacific from challenges to the Light Cannon secondary field test.

PAGE 30 – OPINION AND ORDER

### 3. Business Necessity

The ADA provides a "business necessity" affirmative defense, which provides, as relevant here, that a qualification standard that screens out persons regarded as disabled may be defensible if it is "shown to be job-related and consistent with business necessity." 42 U.S.C. § 12113(a). "Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity." *Rohr v. Salt River Project Agric. Imp. & Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009); *see also Bates*, 511 F.3d at 992-93. Because "disability" includes "regarded as" disabled, this standard applies here. DeFries has shown that the Light Cannon tends to screen out persons with no or minimal color vision deficits. Thus, the burden is on Union Pacific to show job-relatedness and business necessity.

"To show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Bates*, 511 F.3d at 996. In other words, "[a]n employer urging a business necessity defense must validate the test or exam in question for job-relatedness to the specific skills and physical requirements of the sought-after position." *Id.* at 996 n.12 (quoting *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946, 951 (8th Cir. 1999)). "To show that the disputed qualification standard is consistent with business necessity, the employer must show that it substantially promotes the business's needs. . . . The business necessity standard is quite high, and is not to be confused with mere expediency." *Id.* at 996 (cleaned up).

Union Pacific fails to meet its burden of showing this affirmative defense as a matter of law. As discussed, DeFries has presented evidence raising issues of material fact regarding the efficacy of the Light Cannon test and whether it screens out persons with perceived color vision deficits who are able to perform the essential functions of their job. This goes to both prongs of

this affirmative defense. As DeFries points out in his brief, this case is similar to *Rohr* in the

discretion given to the agency and how that wide discretion affects the business necessity

defense. As the Ninth Circuit explained:

> Salt River asserts that its respirator certification test, including the
> breathilator test, was a business necessity because it is mandated
> by OSHA. However, OSHA's requirements are not so specific.
>
> * * *
>
> This is not a case where an employer merely implemented the
> medical certification program required by a federal agency. Rather,
> OSHA's regulations were sufficiently broad to allow Salt River the
> discretion to determine how, and how often, it would evaluate its
> employees' ability to use a respirator. As such, there is a genuine
> issue of fact whether Salt River could have provided reasonable
> accommodations to enable Rohr to complete the test. Indeed, the
> ADA provides that "[t]he prohibition against discrimination . . .
> shall include medical examinations and inquiries." 42 U.S.C.
> § 12112(d). Salt River has failed to show the necessity of the
> particular breathilator test that it used in the evaluation, or the
> absence of any alternative respiratory evaluation appropriate for
> individuals with high blood pressure. *See Bates*, 511 F.3d at 996.
> Salt River also failed to show that any such alternative method
> would impose an undue hardship. *See id.* Therefore, there is a
> genuine issue of material fact regarding all elements of the
> business necessity defense.

*Rohr*, 555 F.3d at 862-63 (alterations in original) (citation omitted).

The same principle applies here. Union Pacific was given broad discretion to implement a

type of secondary testing and to create a field test if it chose that type of secondary testing.

Union Pacific fails to show the necessity or the job-relatedness of the *Light Cannon* test.

### 4.  Direct Threat

Union Pacific argues that it is entitled to "rely on qualification standards that require an

employee to not pose a direct threat to the safety of others while in the workplace." ECF 49 at 31

(citing 42 U.S.C. § 12113(b)). The "qualification standard" at issue in this case is the Light

Cannon test. To prove the direct threat affirmative defense, Union Pacific must show that

DeFries posed "a significant risk to the health or safety of others." 42 U.S.C. § 12111(3).[7]

Determining whether "an individual poses a 'direct threat' shall be based on an individualized

assessment of the individual's present ability to safely perform the essential functions of the job.

This assessment shall be based on a reasonable medical judgment that relies on the most current

medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). This

determination includes consideration of: "(1) The duration of the risk; (2) The nature and

severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The

imminence of the potential harm." *Id.*

Union Pacific argues that there is no disputed issue of fact that DeFries represented a

direct threat because he failed the Ishihara and twice failed the Light Cannon and thus had color

vision acuity deficits. Union Pacific contends that because DeFries could not be certified under

FRA regulations for color vision acuity, he was a significant risk to the health and safety of

others and posed a risk of causing a train crash.

The problem with Union Pacific's argument is that it presupposes the efficacy of the

Light Cannon test. FRA regulations specifically accept that an engineer or conductor can fail the

Ishihara and still have sufficient color vision acuity to perform their essential job functions.

*See* 49 C.F.R. §§ 240.121(e), 242.117(j) (establishing secondary testing); Best Practices, 80 Fed.

Reg. at 73123 ("FRA's longstanding view is that there are some people who, despite not meeting

the vision threshold in 49 CFR 240.121(c) and 242.117(h), have sufficient residual visual

capacity to safely perform as a locomotive engineer or conductor."). DeFries challenges in this

lawsuit whether the Light Cannon secondary test actually screens out persons with color vision

---

[7] Because this case involves a claim that DeFries was regarded as disabled, the
reasonable accommodation element of this affirmative defense is inapplicable. *See Walker v.
Union Pac. R.R. Co.*, 2024 WL 5165208, at *1 n.1 (D. Or. Dec. 19, 2024).

acuity problems or instead screens out persons with normal color vision acuity and minimal color vision deficits that are not disabling and still enable the person to perform the essential job functions of conductor and engineer. As discussed, DeFries has presented sufficient evidence to create an issue of fact on the efficacy of the test. This would enable a reasonable juror to conclude that despite failing the Light Cannon, DeFries could still perform the essential functions of his job and thus would not be pose a direct threat.

DeFries also has presented sufficient evidence to create an issue of fact related to his own color vision acuity. As previously discussed, he provides the expert opinion of Dr. Neitz and his DOT vision testing. DeFries also notes that he performed his job without problems for 14 years and passed Union Pacific's earlier CVFT test, as additional evidence providing context to the more recent evidence. This is enough to preclude summary judgment on Union Pacific's affirmative defense of direct threat. Union Pacific fails to meet its burden that it has proven this defense as a matter of law.

## CONCLUSION

The Court DENIES Defendant Union Pacific's Motion for Summary Judgment, ECF 49, Supplemental Motion for Summary Judgment, ECF 86, and Motion to Dismiss, ECF 96.

**IT IS SO ORDERED**.

DATED this 7th day of March, 2025.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge